The proofs show, that the Missouri arrived in the port of New York, on the 1st of October, 1868, from Havana, and proceeded, by way of the Narrows, to pier 4, North river, where she lay until October 8th. She came directly from Havana to this port, and such goods as were brought in her, were imported and brought into the United States when brought within the limits of a port of entry, with the intention of unlading them there, U. S. v. 10,000 Cigars [Case No. 16,450], and cases cited.

---

## Case No. 9,654.

### The MISSOURI.

[1 Spr. 260; 18 Law Rep. 38.] [1]

District Court, D. Massachusetts. Dec., 1854.

SALVAGE — FRAUDULENT CONSPIRACY — WHO AFFECTED BY THE FRAUD —CONCEALED PROPERTY.

A vessel had been saved from going to pieces on the rocks, with the aid of the master and crew of another vessel, and was subsequently stranded. While the property on board was in the process of transportation to the other vessel, with their aid, and was still in danger, the masters of the two vessels engaged in a fraudulent conspiracy to appropriate to their own use a portion of the property saved. Part was afterwards.

[1] [Reported by F. E. Parker, Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission. 18 Law Rep. 38, contains only a partial report.]

remitted to the owners. The master of the salving vessel brought a part to a home port, and concealed it. It was subsequently discovered by other persons, and seized on a libel, in behalf of the owners and crew of the salving vessel, for salvage: *Held*, that the fraudulent conduct of the master did not defeat their claim; that they were entitled to salvage, both on the property concealed, and on that remitted, and had a lien on the former for the salvage due on both.

[Cited in U. S. v. Stone, 8 Fed. 250.]

This was a libel [against A. T. Leach and others] in behalf of the owners and crew of the ship Sterling, of Salem, Henry C. Pitman, master, for salvage on a large amount of specie, and some other property, taken, and alleged to have been saved, from the barque Missouri, of New York, Samuel N. Dixey, master, when wrecked on the coast of Sumatra. The master and first and second mates of the Sterling were not parties to the libel. In October, 1850, the Missouri and Sterling were lying together in Rigas Bay, waiting to take in cargoes of pepper; each with a large amount, (the Missouri about $24,000,) of specie on board. In the afternoon of October 31st, the Missouri got under way to leave the bay, but was taken aback, at the entrance of the harbor, by a head wind, and let go her anchor. The next morning she was riding with one anchor, very near a high rocky bluff, and as the libellants' witnesses testified, with a heavy sea running, and a gale blowing on shore. Captain Pitman came on board about 10 a. m., and remained a half hour, or an hour, and then left, after making an arrangement that Dixey should hoist a signal, in case he wished to get under way. In the afternoon, about 4 o'clock, the Missouri still riding with one anchor, a signal was hoisted, and Pitman, with four men, came to the Missouri. Just before he reached her, the cable parted; another anchor was let go, but the cable of that also parted. Pitman and his men assisted in making sail on the vessel. She weathered the point, and came into a bight between two rocky bluffs, with a sandy beach about half a mile long, the wind and sea setting in upon the beach. They attempted to tack, but, owing to the chains under foot, she missed stays. The kedge was thrown out, but came home, and she went stern on, upon the beach. A large amount of specie was removed to the Sterling that night; and, either the night of the wreck, as the claimants contended, or the next morning, as the libellants admitted, while the alleged salvors, or some of them, were still engaged in saving articles from the wreck, Pitman and Dixey agreed to appropriate about two-thirds of the specie to their own use, and to restore about one-third to the owners, reporting to them that the Malays had stolen the remainder; part of which the libellants contended the Malays did actually take. No attempt was made to get the Missouri off, at any time. The Sterling proceeded to Analaboo, where Dixey procured another vessel, which he manned with his crew, and sailed for Penang, taking with him part of the specie, and part he left on board the Sterling, in charge of Captain Pitman. After their separation, Dixey remitted to his owners, in New York, by bills of exchange, the sum of $7,355.18. Pitman completed his cargo, and arrived at Holmes' Hole in the winter of 1851. When there, he went on shore and secretly buried in the sand a large amount of specie. Subsequently, Pitman and Dixey were indicted for stealing and plundering from the Missouri, on the coast of Sumatra. Dixey pleaded guilty, and Pitman was tried and convicted, at the March term of this court, A. D. 1852. Before this, information having been obtained in regard to the burial of the money, a reward was offered, and about $7,500 was discovered near Holmes' Hole, brought to Boston, and placed in the custody of the court. Against this specie, the present libel was filed. On the trial of the present case, a great deal of evidence was introduced, bearing upon the conduct of Pitman and Dixey, in regard to the management of the vessel and the disposition of the specie, the danger incurred from the Malays, the probability that any of the specie fell into their hands, the burial of the money at Holmes' Hole, the expense and trouble incurred in recovering it, and other matters. This evidence it is not necessary to give in detail. The conclusions of fact, reached by the court, appear in the opinion.

R. H. Dana, Jr., for libellants. This argument is not reported, as the points and authorities will be found sufficiently referred to in the opinion of the court.

Rufus Choate and Geo. S. Hale, for claimants, suggested that there were circumstances in the case, which gave rise to the suspicion that the Missouri might have been purposely wrecked, and as to this, referred to the authorities cited to the other points. No salvage is recoverable, because the loss was occasioned by the negligence of Pitman, agent of the owners of the Sterling. The Duke of Manchester, 4 Notes of Cas. 575; Shersby v. Hibbert, 5 Notes of Cas. 470; The Neptune, 1 W. Rob. Adm. 297. The negligence which will defeat a claim for salvage, is not necessarily gross negligence, but ordinary negligence, for a person of the experience and occupation of the alleged salvors. The Cape Packet, 3 W. Rob. Adm. 125; The Dygden, 1 Notes of Cas. 115. No claim for salvage can be entertained, because the specie was taken from the Missouri animo furandi. No title to property, or right to compensation, can be acquired for any one by a violation of the law. "Ex dolo malo non oritur actio. Jus ex injuria non oritur. Non debeo melioris conditionis esse quam auctor meus, a quo jus in me transit." Broom, Leg. Max. 571. An attachment, effected by illegally breaking the defendant's door is invalid. Ilsley v. Nichols, 12 Pick. 270. A common carrier has no lien on goods unlawfully put

into his hands and transported. Robinson v. Baker, 5 Cush. 144.

By the general principles of salvage, the act on which the claim is founded must be lawful. Talbot v. Seeman, 1 Cranch [5 U. S.] 3, 28; The Alerta, 9 Cranch [13 U. S.] 359, 367; The Bee [Case No. 1,219]; The Florence, 20 Eng. Law & Eq. 607, 616; The Barefoot, 1 Eng. Law & Eq. 661; Clarke v. The Dodge Healy [Case No. 2,849]; Rowe v. The Brig [Id. 12,093]; The Adventure, 8 Cranch [12 U. S.] 221, 227; The Fleece, 3 W. Rob. Adm. 279; The Blenden-Hall, 1 Dod. 414. And see Laws Oleron, art. 25, in 1 Pet. Adm. Append. 39. The right to salvage is founded on enlarged principles of public policy, as a reward to noble conduct. It is designed to encourage honesty, and discourage fraud. The Boston [Case No. 1,673]; Talbot v. Seeman, supra; The Emulous [Id. 4,480]; The Henry Ewbank [Id. 6,376]. But where the act, without which there is no salvage, is in itself a gross crime, these principles forbid a reward.

It is everywhere admitted, that embezzlement, or gross misconduct, forfeits a vested claim for salvage, as against the guilty party. What, then, is the ground of the owners' claim to salvage, independent of the guilty master? Admitting that an embezzlement by him, subsequent to the vesting of a salvage claim by meritorious acts, might not affect their right, still, when the act of crime is inseparable from the salvage service, and the disposition made of the property saved is designed to carry out a felonious purpose, the nature of the act defeats any claim for salvage; or, to speak more correctly, no claim for salvage can arise. Here the libel alleges, that this salvage service was the removal to the Sterling, and previous acts of the salvors. But this removal was larceny; it was a felonious trespass. What, then, is the foundation of the owners' claim? The early English authorities do not seem inclined to favor it. It has been said, "The master and crew are, in strict language, the only salvors;" that "in former times, before the introduction of steam vessels," the claim of owners was only "incidentally" entertained. Cases where the ship herself rendered considerable service, were considered as a sort of exception. Dr. Lushington says, the owners of a steam vessel "may come in and make a claim, as owners of the vessel, incidental to the claim of the master and crew." The Beulah, 2 Notes of Cas. 61; The San Bernardo, 1 C. Rob. Adm. 178; The Vine, 2 Hagg. Adm. 1; The Salacia, Id. 264; The Charlotte, 3 W. Rob. Adm. 72, 6 Notes of Cas. 281; The Two Friends, 2 W. Rob. Adm. 349. Thus, we contend, their claim is recognized, as derivative and incidental, arising from, and depending on, the master's act. The crew may stand on a different footing from the owners. They labor with their hands; they incur personal hazard, and their claim may be considered as original and independent, and, therefore, be not affected by

a fraud, like that here committed, while that of the owners is defeated by it.

Here it has been held by Story, J., that the master has an implied authority from the owners to save property. The Nathaniel Hooper [Case No. 10,032]. And the same judge says: "A salvage crew cannot, by any shuffling, or management, deprive the owners of their right to share in the salvage. They must take or lose in common with the latter." The Henry Ewbank, supra, 419. See The Robert, 3 C. Rob. Adm. 202. And in The Britain, 1 W. Rob. Adm. 40, it is held, that the master may bind his owners, by an agreement to do salvage service, for a specified sum. Salvage service, then, is in the course of his employment, and the owner is responsible for acts done in the course of such employment, though wilful and malicious, criminal and not authorized. Dias v. The Revenge [Case No. 3,877]; Ralston v. The State Rights [Id. 11,540]; Die Fire Damer, 5 C. Rob. Adm. 358. The act, whatever it is, is the foundation of their claim. "Qui sentit commodum sentire debet et onus." Adopting the act, they adopt its consequences, and such ratification is equivalent to a previous authority. Broom Leg. Max. 553, 557, 679. Would the owners have a claim for salvage if Pitman and Dixey had wilfully cast the Missouri away, with the design, which it is admitted they formed and attempted to carry out afterwards, of appropriating a part not designated to themselves? The specie would be in as much danger, and the owners as innocent, as now. But it would be an outrage on every principle of justice and sound policy, to permit a felon to recommend himself to his employers, and afford a motive to them to protect him against his crime; by securing a large reward for them, by that crime, and to enforce, by the aid of a court of justice, compensation for an act which is part of a scheme in defiance of all justice. Gross negligence of salvors, pending the salvage, forfeits the owners' claim for previous meritorious services. The Duke of Manchester, supra. Why not larceny of the property saved? In the cases of The Florence, and The Barefoot, the owners' claim was held to be forfeited, or prevented, by the alleged acts of the master and crew, if proved.

The Rising Sun [Case No. 11,858], cited by libellants, was purely a case of subsequent embezzlement, i. e., subsequent to meritorious acts, by which, it may perhaps be said, the claim for salvage had vested. It does not appear, as a matter of fact, in The Boston [Id. 1,673], or Mason v. The Blaireau, cited by the libellants, that the embezzlement was committed before the property saved reached a place of safety. In The Blaireau, 2 Cranch [6 U. S.] 240, it was held immaterial, whether it was committed before or after reaching the port of Baltimore, as to the question then before the court; but Judge Marshall said: "The fact must have occurred before he parted with the possession acquired by the act, on the merit of which his claim for salvage

is founded." There can be no claim for salvage on the money remitted. The felonious taking applied to the whole sum, and infected the whole transaction. The remitting was part of the fraud, designed to assist in concealing it; furthermore, the remedy for salvage on that is only by a libel in personam against the owners, to whom it has been delivered. Lewis v. The Elizabeth & Jane [Case No. 8,321]; Brevoor v. The Fair American [Id. 1,847]; The Nicolai Heinrich, 22 Eng. Law & Eq. 617. And for the salvage, if any, due on this, there is no lien on the rest. When this specie was taken out by the claimants, they entered into a stipulation to pay the sum decreed by the court, as salvage. On what? Only on the specie for which they stipulated. If salvage on $15,000 can be decreed here, when $7,500 have been seized on the libel, the stipulators might be held to pay more than the value of the property libelled, which can never be intended. And see The Ooster Eems, cited in The Two Friends, 1 C. Rob. Adm. 271, 284, note; The Progress, 1 Edw. Adm. 210; The North Carolina. 15 Pet. [40 U. S.] 40; Cutler v. Rae, 7 How. [48 U. S.] 729. There is no right to salvage on the specie found at Holmes' Hole. It is well settled, that salvage is only due on property actually saved, however meritorious the services of the salvors. The Dodge Healey, supra; The Ranger, 3 Notes of Cas. 590. And when the salvors, having performed salvage services, abandon the property, they forfeit their claim. The India, 1 W. Rob. Adm. 406. This specie was abandoned,—not restored to the owners, but abstracted from them, and concealed. The true salvors are those who dug it up on the island. It was recovered solely by their exertions, and those of the claimants, without any assistance from any one of the libellants, and if the whole matter had been left to them, it would never have been recovered. If any salvage is given here, it must be small. There was no deviation, no risk, no loss of time, little labor; and a large deduction must be made for the expenses incurred by the claimants in recovering the specie, and for the articles not restored.

SPRAGUE, District Judge, delivered his opinion, in substance, as follows:

There is no doubt that the Missouri and cargo were in peril, at the time referred to, and in a condition to be the subjects of salvage service; and that the libellants rendered a salvage service, in taking from the vessel a large quantity of specie, a great part of which has come to the possession of the claimants. The safety of this specie is owing to voluntary exertions of the seamen of the Sterling, and to the use of the Sterling herself. But the claimants insist, that there are facts here which defeat this claim; that there was a fraudulent conspiracy by the masters of the two vessels to embezzle part, at least, of the money. It is not denied that there was a conspiracy and actual embezzle-

ment; but it is contended by the libellants, that those only who participated in the fraud should suffer for it, and that the innocent should not bear the penalty. The research and learning of the counsel have produced no case, where the courts have gone further than to inflict that punishment on the guilty; none where they have gone so far as to decide that others, not personally implicated in the offence, shall forfeit their right. Two cases are relied upon: The Florence, and The Barefoot. In the former, there was no misconduct, and no forfeiture. In the latter, the vessel having been sunk on the coast, several small vessels from the shore interfered, and obstructed the owners of the cargo, in their endeavors to save it. The owners of these vessels did not assert their innocence, and it was not even suggested that the wrongful interference was without their assent.

But it is insisted that the circumstances of this case go beyond any which have as yet been reported, on the ground that the act here performed, on which the libellants' claim was founded, was fraudulent in its inception.

It is urged that it is not a case of subsequent embezzlement, but of a fraudulent conspiracy in the beginning, that the property should be originally taken for a fraudulent purpose; that, as Captain Pitman had the control of the Sterling and her crew, and intended by his acts to commit a fraud, the owners and crew, as well as himself, can claim only through a fraud, which the law does not allow. And this, certainly, deserves consideration. I think it clear, and, indeed, it is not distinctly contended otherwise, that there was no fraud, or misconduct, previous to the stranding. The proof is, that the skill and labor of Pitman and his men assisted materially in saving the vessel from total destruction. There is no ground to presume that any fraud was conceived, until after the vessel was wrecked upon the beach. But the salvage service had been previously commenced, by saving the vessel and cargo from total loss upon the rocks. With respect to the time of the conspiracy, the evidence shows that after the stranding of the Missouri, and before the removal of the specie, while it was in preparation for removal, the appropriation of it to their own use was suggested by Dixey to Pitman; and the latter testifies that the only objection he made, was the danger of discovery. I am satisfied, that, although at that time there was no settled plan, as to the division of the money, yet that the proposition was so far entertained that Captain Pitman acceded to measures designed to conceal the real quantity of specie, and to a misrepresentation of the quantity, which would be a means of deceiving others. I cannot but consider their whole conduct as intended, at the time, to place themselves in a position to take advantage of any opportunity to appropriate the specie; and that Pitman was willing to

wait and see if it could be done, and, if so, to join in the crime. I think his intention was to keep the course of proceeding in his own power; and that must affect his conduct, so as to give it the character of a fraudulent transaction on his part, from the time of the first suggestion by Dixey.

Therefore, so far as the facts are concerned, I find that before the specie was fully transferred, and while it was in process of transportation, there was a fraudulent conspiracy designed to be carried into effect, if means could be found for concealment, and that the parties did subsequently carry it into effect.

I shall now consider the two different funds to which this claim relates.

First, as to the sum of $9,000, which it is said the parties intended to restore to the owners. That was taken from the Sterling by Dixey, and the greater part of it transmitted to them. That was originally saved, avowedly, for the owners, and came to their use; but it is insisted, that no salvage is due on that because it was contaminated by the general fraudulent intent. But shall that defeat the claim of the crew and owner? Why should the crew be deprived of their reward? It is said, because the master entered into a fraudulent conspiracy. But it is not pretended, that they participated in it. What is their condition? The vessel was stranded. They went on board, rescued the specie, transported it to the Sterling, and delivered it to the agent of the owners. This was the service of the crew, aided by the vessel.

A claim for salvage rests on two grounds, —individual justice and public policy. Why should the crew be deprived of it, on either ground? Their services were faithfully rendered, and on the ground of private justice, their claim is the same as in any other case. As to public policy, that policy generally favors the preservation of property. It is for the interest of mankind that the fruits of human labor should be preserved. It is the policy, too, of every country, that its own property should be preserved. Its preservation is beneficial, into whatever hands it falls; but the original owner must not be divested of more than that policy requires. The books state, in detail, various elements to be taken into consideration, in determining the amount to be paid to those who have rendered a salvage service, but I have nowhere seen a satisfactory general principle laid down. I think the true principle of the salvage reward is, to give a sufficient inducement to render the service promptly, perseveringly, and honestly. And in some cases, as on a dangerous coast, to offer sufficient inducements to competent persons to keep themselves in a state of preparation to afford relief, and to be watchful in the discovery of objects requiring it. This accords both with public policy and the true interest of the owners.

It must be remembered, that salvage is a contingent compensation. And the law should afford an inducement to exertion, where it is as yet unknown whether any reward will be secured. Without this, there will be nothing but motives of humanity operating upon the mind.

Sometimes great exertions are made, and great hazard and loss incurred, without success, and public policy requires that such a promise of reward should be held out, in case of success, that all those in a situation and competent to render relief, shall be eager to do so, from the mere hope of gain; for example, that the sailor, who alone sees from the mast-head a vessel in distress, or the master, who descries her at a distance, with a telescope, shall not be tempted to pass her by, but shall have a prospect of pecuniary advantage, which may prompt his efforts.

Why, then, deprive the seamen of their reward, because another man has acted with an improper purpose? If, indeed, his fraud is so carried out, that the property is not restored, they lose that reward; but that is because their efforts are not ultimately successful.

There is, however, a technical argument, that they claim through the master, and under him. But salvage service is voluntary. The master has no authority to compel seamen to engage in it. I do not mean to say that they may not be bound to act under his orders, if they engage in the service; but the service itself is voluntary.

Further, the salvage service did not begin with the removal of specie. It began when they went on board, and assisted in making sail on the Missouri, to weather the point. There was a salvage service in thus relieving the vessel and cargo from the imminent peril of going on the rocks,—continued by saving the cargo and part of the appurtenances of the vessel.

This was, undoubtedly, in aid of the Missouri's crew, but that is unimportant. Dixey continued to be master, so long as they remained on board of the Missouri. The only thing that can be said to vary this from other cases, is, that possession continued in Dixey, until they got on board the Sterling. Then the possession was in Pitman and his crew; because Pitman was in command, and Dixey was under his control. If Dixey was assigned, as it is argued, a particular part of the cabin, and the specie placed in his charge, still I do not think that changes the legal or equitable aspect of the case.

The salvage service was honestly performed by the crew, and then the property was intrusted by them, as perhaps they were obliged to intrust it, since they could not control it on board of the Sterling, to the custody of Pitman.

As to the right of the owners of the Sterling, it is argued by the claimants that, in the cases where salvage was allowed to the owner, but forfeited by the guilty party, the embezzlement took place after the property had reached a place of safety. I do not find

that question raised in the cases, and do not see why the cases cited by the libellants' counsel do not cover this point. See Mason v. The Blaireau, 2 Cranch [6 U. S.] 240; The Boston [Case No. 1,673]; The Rising Sun [Id. 11,858]. In all these cases, the embezzlement was while the property was in the care and custody of the salvors. There is no difference in principle between embezzlement before and after the property has been brought to a place of safety, and while still in the possession and control of the salvors. But it is contended that the master is the agent of the owners, and that they claim through his fraud, which the law will not permit. But is it so? What had the owners to do with the fraud? Nothing. It was not authorized by them. The truth is, the acts of Pitman were as well a fraud on the owners of the Sterling, as on those of the Missouri, and intended to deprive them of their share of the salvage. Why should the owners of one vessel say to those of the other, your agent conspired with my agent to commit a fraud, and you shall lose by it for my benefit. But I do not rest the decision on this alone. There is no real distinction between this and the other cases.

It is said that the whole claim is through Pitman. How so? He had the power to use their property, but it does not set up, or sanction, his fraud, for them to claim a salvage reward for such use. There was an original service by the owners, as much as by the mariners. Their ship was used; the time of the crew, paid for by them, and their provisions, were used. The whole service was co-ordinate. The men could not act without the ship, nor the ship without the men. The right to salvage accrues from the use of the vessel.

In the early English decisions, the courts seem reluctant to acknowledge the rights of owners, and in some cases have magnified the claims of the master, at their expense, attributing to him the whole merit of the use of the vessel, without considering whether it was by the authority or assent of the owners, or not; but the true view is, to regard him as being permitted by the owners to use their property. If he does so, and loses their vessel, it is their loss, and he is not called upon to make it good. The owners consent to, and authorize the salvage of the property, but not that he should secrete or embezzle it. That is not his agency, and when he does that, it is without their sanction. It is a matter of public policy, to hold out to them an inducement to permit the master to use their vessel. If they should instruct him not to save property, he would be bound by their orders. And they will so instruct him, if the law does not give them, not only a full indemnity, but an additional pecuniary reward.

Now the probability of the reward is an element to be weighed, as well as the amount; but by the doctrine now contended for, in addition to the ordinary contingencies of salvage service, they must run the risk of the master's honesty.

As to the $9,000, my opinion is, that the owners are entitled to salvage on that amount, or on so much of it as was restored.

With respect to the portion recovered, at Holmes' Hole, I have had more difficulty. That did not come to the owners' use, by the mere act of the salvors. It was concealed on board of the Sterling; was separated from the rest, with the knowledge of Pitman only; brought to Holmes' Hole, and there buried; and has come to the owners' hands by other means. And the question is, whether the right to salvage is lost. I have reflected on this, and have come to the conclusion that it is not. To sustain a claim for salvage, the property must be saved, the salvors must contribute to its safety, and the property must come to the owners' use, or within their reach. Here, the property was saved from impending peril, and has come to the use of the owners. To be sure, the salvors have not personally delivered it. The captain has embezzled it, or at least attempted to do so, and endeavored to deprive them of it. He did not succeed; and it is now in the hands of the claimants. The merit of the owners and seamen is the same, as if no fraud had been attempted by the master. Had Pitman succeeded in his fraudulent attempt, no salvage would have been due; because the property would never have reached its owners. As an illustration, suppose a ship, with treasure on board, is sunk on the other side of the globe, and a vessel is fitted out, proceeds to the spot, and with risk and labor succeeds in obtaining it, and then puts it on board of a third vessel, to be brought home, and on the passage, the master and crew of the latter vessel attempt to embezzle it, but unsuccessfully, and it finally comes to the hands of the owners; shall the original salvors be deprived of their reward? I see no principle of justice, or policy, which requires it.

I think the libellants are entitled to salvage on the $7,500. On the question, whether there is a lien on each part for the whole salvage, I have no doubt. Where the whole property belongs to the same person, there is no reason for saying to the salvors, if you permit any portion of it to go beyond the reach of process, you shall lose your lien upon the residue, for the salvage on such portion. Such a rule would be inconvenient to both parties.

It is for the interest of the owners, that no more of the property should be withheld from them than is necessary for the security of the salvor.

The circumstance that a portion of the specie was separated from the rest, and remitted to the owners by Dixey, their master, can make no difference. The lien for salvage in no degree depends on possession. It is true, that Judge Peters, in Brevoor v. The

Fair American [Case No. 1,847]; and after him, Judge Woodbury, Packard v. The Louisa [Id. 10,652],—held the contrary; but they were under a mistake. An admiralty lien is a privilege, a jus in re, perfect where there never has been possession, or where it has been lost or relinquished. To this familiar and well-established doctrine, the lien for freight is an exception, but that for salvage is not.

In determining the amount of salvage to be awarded, it is to be borne in mind, that there was no deviation, or detention, of the Sterling, which could affect her insurance, or delay her voyage; as she was at her anchorage, waiting for the pepper crop, and the services of the crew were of short duration, and attended with no particular hazard.

The amount on which salvage is to be given is $15,103.91. It appears that all but six of the crew have been settled with. I award to the owners of the Sterling $600; to each of her seamen, who was on board the Missouri when she went ashore, $88; to each of her other seamen $53. It appears that $18 was paid to each of them by Captain Dixey, at Analaboo, and receipts taken, expressed to be in full for labor and services. It is contended, that this is a bar to their recovery. Upon all the testimony, I do not think it can be so treated. But the $18 must be deducted from the salvage decreed to each man.

Decree accordingly.

---

MISSOURI, The (UNITED STATES v.). See Case No. 15,785.

MISSOURI, K. & T. R. CO. (UNITED STATES v.). See Case No. 15,786.

MISSOURI, K. & T. R. CO. (WILLIAMS v.). See Case No. 17,728.

MISSOURI RIVER, FT. S. & G. R. CO. (ARMSWORTHY v.). See Case No. 550.

MISSOURI RIVER, FT. S. & G. R. CO. (STROUD v.). See Case No. 13,547.

MISSOURI VAL. LIFE INS. CO. (CLIPPINGER v.). See Case No. 2,901.

MISSOURI VAL. LIFE INS. CO. (SMITH v.). See Case No. 13,083.